Burrows, J.
John Bose was indicted for the killing of Clara Seigler on the 30th day of May, 1895. The indictment charges the defendant with murder in the first degree.
The case was tried to a jury, and resulted in a verdict of guilty. A motion for a new trial was overruled, and a bill of exceptions taken containing all the evidence. The record is voluminous, and we have given to the case such attention as its importance seemed to deserve.
1. On the trial of this case evidence was admitted as to the early history of the deceased and the accused. Testimony is given that the defendant came into the neighborhood where the decease'd was living in 1888 or 1889; that he was seen in her company frequently; that she was seduced by the accused; that a prosecution for bastardy was instituted and withdrawn; and that the deceased, at that time, was a person of weak mind, and only fourteen or fifteen years of age.
Quite a large portion of this record is devoted to evidence of that character.
This evidence was admitted against the objection and exception of the defendant below. The question is now presented whether this evidence was competent.
It will be understood by all who participated in the trial, that the State had a clear and definite theory in respect to this homicide. The theory was and is, as shown by the record, that John Bose became jealous of the deceased on account of the attentions shown her by Vernon Oaloway and another party called “Little Sammy,” or Richard Cooper; that he was not only jealous, but furious about it; that he talked and gabbled about it to everybody, men and women, and had been doing so for two- weeks before the homicide; that during that time, while laboring under these emotions of jealousy and revenge, he threatened to kill the whole of *344 them time and again; and that this homicide was the offspring of such jealousy,
Of course, relations between the accused and the deceased might properly be put in evidence so far as they illustrated or tended to illustrate the feelings existing between these two persons at and just prior to the time of the alleged homicide; and any such relations might be put in evidence for the purpose of showing a motive for the criminal act; but they could not properly be admitted to prove that the accused was a person of bad character, or had committed other offenses.
The rule, we think, is stated in volume 1, Greenieaf’s Evidence, at section 51:
“Sec. 51. It is an established rule, which we state as the first rule, governing in the production of evidence, that the evidence offered must correspond with the allegations, and be confined to the point in issue.’’
“Sec. 51a. It is not necessary, however, that the evidence should bear dircetly upon the issue. It is admissible if it tends to prove the issue, or constitutes a link in the chain of proof; although, alone, it might not justify a verdict in accordance with it.’’
At section 53 we have the exception:
“Section 53. In some cases, however, evidence has been received of facts which happened before the principal transaction, and which had no direct or apparent connection with it; and therefore their admission might seem, at first view, to constitute an exception to this rule. But those will be found to have been the cases in which the knowledge or intent of the party was a material fact, on which the evidence, apparently collateral, and foreign to the main subject, had a direct bearing, and was therefore admitted.’
It is obvious that the evidence must be confined to the facts surrounding the parties at the time of the killing, and the facts anterior thereto, that throw some light upon the transaction itself.
Necessarily, there are three questions that are important; *345 the criminal act, the preparation for its commission, and the motive for it.
It was competent to show anything that tended to demonstrate that the accused had a motive, some reasonable ground or unreasonable ground,for desiring to deprive the deceased of her life.
The reasons given by Prof. Greenleaf why the evidence should be confined to the point in issue are, that evidence outside of the real issue in the case, must tend to prejudice the accused upon his trial, and to mislead the jury; and that the accused cannot be presumed to be prepared to enter upon an investigation that is not involved in the issue.
For what purpose was the evidence of seduction competent? Certainly it did not bear in any respect upon the act of killing, or the preparation for the commission of the offense. Did it tend to show any motive for it?
It is apparent from this record that the only motive the accused had or could have had -for the killing the deceased was jealousy; and, indeed, this was the theory advanced by the State,and clearly supported by its evidence. His declarations in respect to their previous relations furnished reasons, rather, why he should not and would not have desired to take her life. The only legitimate inference to be drawn from his declarations, or from the facts detailed, of his having seduced her in 1889, was that the accused was a man of depraved and worthless character, and had demonstrated it by conduct which might b.e properly characterized as infamous.
Now, when we turn to the argument in the case, made by the Prosecuting Attorney,which was proper if this evidence was proper, we find that the great burden of his argument is not in reference to the motive for and fact of the killing, but the conduct of the accused in 1889, this cruel, abominable conduct towards this weak-minded girl, when she was fourteen or fifteen years of age.
*346 We are of the opinion that the court erred in the admission of this evidence, and that the error so committed was prejudicial to the accused.
. 2. While the accused was in jail, two reporters, residing in this city, visited him and had conversations with him. Some of it related to this matter upon which I have just commented. During the conversations it was said to him, as appears from, this record,'“Your little boy says that you killed his mamma, and then ran out of the back door; and the old lady says that on that night she saw you go out the back door.” The record discloses the fact, that prior to this he bad denied having any knowledge of or participation in this homicide. The further reply obtained from him was “the little boy will answer whatever is told him,” according to the recollection of one of the witnesses, and according to that of the other, “the little boy will say whatever he is told; if you go and see him he will tell you differently.”
Such a statement as that,made to a prisoner,and a denial of its truth by him, might not ordinarily have any prejudicial effect; but in this case its prejudicial influence cannot be doubted. The Prosecuting Attorney, in his opening statement, refers to it. The boy is brought into court and put upon the stand to testify, and then taken by the judge to another room for a preliminary examination as to his competency. It was demonstrated in the presence of the jury that the child, if permitted to testify, was expected to give important testimony.
In the closing argument it is again pressed upon the jury that the boy had made these statements; that they had been communicated to the accused, and that he had simply made a denial.
It is not claimed that there was a direct admission or a confession, but an indirect admission on the part of the defendant; that when this statement was made to him, his *347 denial was of such ambiguous character as to afford some presumption of guilt.
I again refer to Greenleaf, vol, 1, sec. 197: “Admission may also be implied from the acquiescence of the party. But acquiescence, to have the effect of an admission, must exhibit some act of the mind, and amount to the voluntary demeanor or conduct of the party.”
The first question always is, whether the prisoner was reasonably called upon to make any reply.
We are cited by counsel to section 199 of this same volume, which I read:
“See. 199. But in regard to admissions inferred from acquiescence in the verbal statements of others, the maxim, Qui facet consentiré videtur, is to be applied with careful discrimination.” “Nothing,” it. is said, “can be more dangerous than this kind of evidence. It should always be recei.ed with caution; and never ought to be received at all, unless the evidence is of direct declarations of that kind, which naturally call for contradiction; some assertion made to the party with respect to bis right, which, by his silence, he acquiesces in. ”
In this case, however, there was not only a denial of the statement, but reasons given w-hy no reliance could be placed upon it. He said the old lady was insane, and that was true. He said the little boy would say anything he. was told to say; and looking at the examination that was had before the judge in order to determine his competency, it is apparent that this statement was correct. There was not acquiescence by silence, .and there were no false reasons given by way of explanation or excuse.
Counsel for the State call our attention to the case of Murphy v. The State, 36 Ohio St., 628.
In that case one of the confederates was making a direct admission involving both, of them, and Murphy, by his silence, acquiesced in the statement made on behalf of both and for their joint benefit. .
*348 The learned judge who delivered the opinion in the Murphy case, says, at page 630:
“We are all of the opinion that the declarations of Morrow were properly admitted as evidence on the trial of Murphy. I would have preferred that their admissibility should have been placed on the peculiar circumstances of the case, to which reference has been made, as I doubt whether, as a general rule, one who is under arrest can legally be regarded as called upon to reply to the statements of another touching his guilt. ”
The important effect of this evidence was its tendency to prove that the boy, too young to be a witness, had in fact made the declaration that he saw the accused kill the deceased.
It was error, in our opinion, for the State to introduce these alleged declarations of the boy and the mother of the deceased against the objection of the accused.
3. The whereabouts of the prisoner was shown on the night of the homicide by different witnesses up until a quarter of 12 o’clock, or half past 11:00. From that time he is not seen again until morning, unless he was seen by Margaret Maloy.
As I understand the evidence, shortly after twelve o’clock she was wakened up by her little girl, who was ill and wanted some water. She got up for the purpose of going out to the hydrant on the street. As she went to the yard fence, she saw some one coming, when she retreated into the house. At that time she did not recognize the person who was coming. She nearly closed the door keeping her foot against it. She says she then recognized the person passing by as being John Rose, the prisoner. After he had passed she went out and obtained the water; and shortly after her return to the room, she told her daughter who the man was whom she had seen.
Her daughter, Annie Maloy, a girl 13 years of age, is called to the stand,’ She was permitted to testify that her *349 mother, after she came back into the house, told her who the man was.
It was important for the St^ie to show, if it could, that, at the time Margaret Maloy went to the door, this prisoner was seen coming from the direction of the place of the homicide, and going towards his stable.
Did she, on that night, recognize John Rose? She says that she did, and that she told her daughter that night who it was. And to corroborate such statement the daughter is permitted to testify that her mother told her that night who it was.
As suggested by my brother, Laubie, it comes simply to this; that the State was putting in, by the mouth of another, the declaration of Mrs. Maloy, not under oath,to support the statement under oath.
This evidence, in our opinion, was incompetent, and its admission error.
4. We Lave looked at the requests of defendant below refused by the court, and we think requests numbered ten and eleven, giving the rule to be applied to witnesses who have been impeached, should have been given, in language or substance.
The requests were proper, in view of the evidence, and were substantially in the language approved by the Supreme Court in Mead v. McGraw, 19 Ohio St., 55.
5. Counsel for the accused asked the court to charge as proposition nine:
“A verdict of guilty can never be returned without convincing evidence. The law is too humane to demand a conviction while a rational doubt remains in the minds of the jury. You are justified and required to consider a reasonable doubt assisting, if the material facts without which guilt cannot be established, may be fairly reconciled with innocence. You will look, then, to all the evidence, and if that. *350 satisfies yoa of the defendant’s guilt, you must say so. If you find you are not fully satisfied, but only find that there are strong probabilities of guilt, your only safe course is to acquit. ’’
This was read to the court in the hearing of the jury, and refused.
The court charged the jury upon the question of reasonable doubt, and the amount of evidence necessary to warrant • a conviction, as follows:
“The accused cannot be lawfully convicted unless the ■evidence establishes his guilt beyond a reasonable doubt.
“It is not to the benefit of a doubt, or of any doubt, to which the accused is entitled under the law; he is entitled only to the benefit of a reasonable doubt.
“A reasonable doubt is such serious doubt, as, after a careful examination and full consideration of all the evidence, with a view to arrive at the truth, still remains in the mind of a juror, and because of which he cannot say that he is convinced to a moral certainty of the truth of the charge. The law does not contemplate that a captious or artificial doubt shall be sought and entertained, that the same may serve as a pretext for evading a painful duty.
“It should be borne in mind that in human affairs, absolute certainty cannot always be arrived at. All that the law requires, is that degree of moral certainty which will ■enable jurors to say that the facts satisfactorily established by the testimony are consistent with the guilt of accused, and inconsistent with any other reasonable hypothesis.
“The doubt thus to be respected is one of which the mind ■cannot divest itself, notwithstanding honest effort in that behalf.’’
We think that the charge of the court, taken in connection with the refusal to charge, was misleading. It obscured the important consideration, that the facts proved must be of such convincing and conclusive character as to clearly and fully establish the guilt of the accused.
Counsel for the prisoner asked the court to charge that “a verdict of guilty can never be returned without convincing *351 evidence;” and “if you are not fully satisfied, but find only that there are strong probabilities of guilt, your only safe course is to acquit.” The court charged the jury that absolute certainty cannot always be arrived at, and that the law only requires that degree of moral certainty which will -enable the jurors to say that the facts satisfactorily established by the testimony are inconsistent with any other reasonable hypothesis.
If there are degrees in moral certainty, the law demands ■the highest degree to support a verdict of guilty. In a criminal case, “that degree of moral certainty which will •enable jurors to say” that the facts proved are consistent with guilt, does not come up to the demands of the law.
The facts proved must be so indicative of guilt, and of such materiality and conclusiveness as to overcome the legal presumption of innocence, and compel the jurors, in a conscientious discharge of their duy, to say, that such facts are “incompatible with the innocence of the accused, and incapable •of explanation upon any other reasonable hypothesis than of his guilt.”
It might be suggested, however, that the character of the proof requisite to warrant a verdict of guilty was fully stated when the court charged the jury that, “The accused cannot be lawfully convicted unless the evidence establishes his guilt beyond a reasonable doubt.”
The force and effect of this rule of law was weakened by the subsequent explanations made by the court as to the meaning of the phrase “reasonable doubt. ” The jury was told that the accused was not entitled to the benefit of “a ■doubt” or “any doubt,” or a “captious or artificial doubt,” but only a “reasonable doubt,” a “serious doubt” remaining in the mind of a juror after full and careful consideration of the evidence. ”
And again: “The doubt thus to be respected, is one of which the mind cannot divest itself, notwithstanding honest, •effort in that behalf. ”
*352 While all these explanations of ‘ ‘ reasonable doubt, ’ ’ which tend to confuse and darken the understanding of the jury, can doubtless be found in treatises and decisions, the propriety of explaining a phrase that conveys a definite and precise meaning to the mind of a juror, by the use of words which he can neither define nor understand, is not apparent. It may be safely assumed that the average juror has only a vague conception of the meaning of an artificial or captious doubt, while he perfectly understands that a reasonable doubt is any doubt entertained by an intelligent man conscientiously endeavoring to ascertain the truth.
There is and can be no fixed arbitrary standard of reasonableness in such case. Each juror must rely upon the integrity of his own reasoning faculties; and if, in the honest use of the same, doubts arise in his mind as to the sufficiency of the proof, why should he be called upon, by the charge of the court, to disparage, discredit and reject such doubts, or make an effort “to divest his mind” of them?
We think this ninth request was good law, and ought to have been given, especially in view of the explanations given by the court as to the meaning of the phrase “reasonable doubt.”
The prejudicial effect of the charge arises from the fact that it assumes that any and all doubts, entertained by the jury as to the guilt of the defendant, are, prima facie, unreasonable; and directs the jury not to respect or act upon such doubts until they have made an ineffectual effort to divest their minds of them,
6. Complaint is made that the judge made remarks upon the trial prejudicial to the rights of the accused. Henry Freeman was an important witness for the State. Witnesses were called on behalf of the accused to impeach his reputation for truth. The attempt was made to show that Freeman 'had been known by the name of “thief.”
*353 The impeaching witnesses were from an adjoining county. Counsel for the State were insisting upon their objections to certain questions, when the court, with apparent impatience, makes this remark:
“These witness have come here for a purpose, and they are going to swear to it. What is the use of fooling about it. It don’t amount to anything.”
We all know that the jury are apt to attach great importance to an intimation of opinion made by the judge; and especially is this so when t&e judge is a man of high character and standing, as in this case.
The effect of this remark was simply to “whistle down the wind” this whole attempt to impeach Freeman.
This unfortunate expression tended, in our opinion, to prejudice the accused, and deprive him of a fair and impartial trial.
7. There is another ground of error, that the verdict is against the evidence. We have not fully considered it, and express no further opinion upon it; but for the reasons already given, the judgment is reversed, and the cause remanded to the court of common pleas for further proceedings.
8. Mr. Erskine- — -“I desire your Honor to pass upon the question of the vial.”
Court — I intended to comment upon that. Henry Freeman testified that some days prior to the homicide he had a conversation with the accused upon the subject of obtaining poison to kill rats; and that the accused said, in this connection, that his rats would not eat “Rough on Rats, ” on bread and butter. After the homicide the same witness found a small vial in the stable near the spot where the accused slept, which was delivered to a physician. The physicial was called as a witness for the State, and testified that he administered some of the contents of the vial to a cat, and the cat died. He also testified that he had no other knowledge, by analysis *354 or otherwise, as to whether such contents were poisonous. He was then permitted to give his opinion upon the question, and stated, in substance, that in his opinion the vial contained poison. We are of opinion that the objection to this evidence was well taken, and should have been sustained.
John M. Cook and John W. Trainer, for Plaintiff in Error.
.Emmett E. Erskine, Pros, Att’y, and Dio Rogers, for Defendant in Error.
This witness observed no pathological symptoms indicating that the cat died of poison. The death may or may not have been caused by the dose, and the witness himself said that he was unable to give an opinion upon the question.
' Thereafter the vial and its contents were given in evidence against the objection and exception of defendant.
We think this was error. As a general rule, the facts from which incriminating inferences are sought to be drawn, should be fully proved; otherwise, such inferences may be made to rest on mere conjecture and speculation.
That the vial contained poison was unproved. That the defendant ever had it in his possession was unproved. If both these facts had been proved, then, the further and only important fact, that the accused intended to use it for a homicidal purpose, and for the specific purpose of poisoning Clara Seigler, was not only wholly unproved, but was not inferable from the evidence.