THE STATE OF OHIO, APPELLEE, *v.* SABBAH, APPELLANT.

(No. S-82-15—Decided November 19, 1982.)

*Mr. Ronald J. Mayle,* prosecuting attorney, for appellee.

*Mr. Dennis P. Levin,* for appellant.

BARBER, J. This case is before the court on appeal from the Sandusky County Court of Common Pleas, wherein appellant was convicted and sentenced for violating R.C. 2903.02 (murder).

The undisputed facts precipitating this appeal may be summarized as follows. On the afternoon of January 24, 1982, appellant shot and killed Edward Lee Williams. The shooting occurred in Fremont, Ohio, outside the home of Charles Stark, a friend of appellant. Shortly after the shooting, at approximately 3:30 p.m., appellant was stopped and arrested by Perkins Township police as he drove toward Sandusky on State Route 6. Township officers then read appellant the *Miranda* warnings. He indicated to the officers that he did not wish to speak, and he refused to sign a written police form waiving his rights.

Sometime later, two Fremont police officers arrived at the Perkins Township Police Department and transported appellant back to Fremont. During the thirty-minute ride, appellant made no statements to the police officers. Once at the Fremont Police Station, appellant was given the *Miranda* warnings a second time by a Fremont detective. Appellant again indicated to the officers present that he did not wish to speak with them until he had consulted an attorney.

On January 26, 1982, the Sandusky County Grand Jury returned an indictment against appellant charging him with murder. A jury trial commenced on April 21, 1982. At trial, the prosecution presented evidence tending to show that appellant had a motive to kill Edward Lee Williams because of an earlier altercation between the two men in which appellant claimed Williams stole forty dollars from him. On the day of the shooting, both Williams and appellant, as well as several other people, had been present at the Stark residence watching the NFL Super Bowl game. The prosecution's theory alleged that after Williams left for a brief time to go to a nearby carry-out store, appellant waited outside the Stark residence to ambush him when he returned.

Appellant took the stand and testified to an exculpatory version of the shooting. He maintained that he shot Williams in self-defense. Appellant claimed that during the earlier altercation involving the forty dollars, Williams had brandished a handgun and threatened him. He also testified that subsequent to that incident, Williams proceeded publicly to make threats on his life. Appellant stated that he was leaving the Stark residence on January 24 to go home when Williams returned from the store and accosted him with what appeared to be a handgun. He maintained that he shot Williams in self-defense, believing that Williams was about to kill him. Appellant further testified that, after the shooting, he drove to Sandusky intending to tell his mother what had happened and that he was then going to call the police.

On cross-examination, the prosecutor challenged appellant's exculpatory account of the shooting. Over timely objection by defense counsel, the prosecutor was permitted to ask appellant why, after his arrest, he failed to tell the police his self-defense story. In his closing argument to the jury, the prosecutor, over objection, was permitted to argue the significance of appellant's failure to inform the police that he shot Williams in self-de-

fense and that Williams had been carrying a gun.

At 5:45 p.m. on April 23, the jury retired to the jury room to begin its deliberations. At 6:30 p.m., the jury sent the court a note in which it requested a copy of the court's instructions on self-defense. The court re-read those instructions and the jury returned to its deliberations. Approximately three hours later, the court received a second, very detailed note from the jury. The court instructed the jury to continue its deliberations with a view toward reaching a verdict. At approximately 11:00 p.m., the jury returned a unanimous verdict of guilty. On May 3, 1982, appellant was sentenced to a term of imprisonment. From the judgment of the trial court, appellant now appeals.

In bringing this appeal, appellant presents six assignments of error for review, the first three of which are:

"I. Appellant was denied due process of law guaranteed by the Fourteenth Amendment to the Constitution of the United States and Article I, Section 10, of the Constitution of the state of Ohio when the trial court permitted the state to use appellant's post-arrest/post-*Miranda* warning silence for impeachment purposes.

"II. The trial court erred in permitting the state to use appellant's pre-arrest silence for impeachment purposes at trial.

"III. The trial court erred in failing to give a limiting instruction to the jury with regard to the testimony concerning appellant's post-arrest silence. Such error violated both the Fifth and Fourteenth Amendments to the Constitution of the United States and Article I, Section 10, of the Constitution of the state of Ohio."

Trial testimony relevant to the disposition of appellant's first two assignments of error is set forth below.

After testifying that he shot Williams in self-defense, appellant's direct examination continued as follows:

"Q. [Defense Counsel:] What was your condition of your mind at the time

* * * [Williams] came out and started toward you?

"A. [Appellant:] I was scared to death.

"Q. Oh, and after this took place, you got in your car, is that correct?

"A. Yes.

"Q. And you were heading towards Sandusky?

"A. Yes.

"Q. For what reason?

"A. I was going to go tell my mother and then call the police. I was scared.

"Q. Did you ever get home?

"A. No.

"Q. The police stopped you before you got home, right?

"A. A State Patrolman started following me before I got out of Fremont."

On cross-examination, the prosecutor attempted to impeach appellant's credibility as follows:

"Q. * * * [After the shooting] you did not go to the police station, did you?

"A. No, I was trying to get out of Fremont, period. I didn't want any more —

"Q. And you didn't — You were trying to get out of Fremont, right?

"A. — trouble. I didn't want any more trouble.

"Q. And you didn't stick around and wait for the police to come so that you could explain this to them, did you?

"A. No. I could have got shot if I had stuck around.

"Q. And until this very day you have never told the police that you did this in self-defense, did you?

"A. I didn't explain it with nobody.

"MR. LEVIN: Your Honor, objection, I ask that that be stricken and the Jury be instructed to disregard that.

"THE COURT: Overruled.

"Q. You have never, until you got on this stand here today, told anybody, with the possible exception of Jack Levin, that this shooting occurred as a result of self-defense, have you?

"MR. LEVIN: Objection, your Honor.

"THE COURT: Overruled.

"A. I wasn't going to explain it to nobody.

"* * *.

"Q. Then after you had left the area, were on your way back to Sandusky, you were stopped and arrested by the Perkins Township Police Department, isn't that correct?

"A. Yes.

"Q. Did they tell you why they had stopped you?

"A. Yes.

"Q. Did you make any protestation to them? Did you say to them 'Gee whiz, I was only protecting myself?'

"MR. LEVIN: Objection, your Honor. He's got a constitutional right. He knows that.

"* * *

"Q. Your testimony earlier to Mr. Levin was 'I was going home to tell my mother and then I was going to tell the police.' Isn't that what you said?

"A. Call the police.

"Q. Call the police. Now you're on your way home, the Perkins Township Police stop you on Route 6 — You were on Route 6, right?

"A. Yes.

"Q. Now here you've got some policemen that you can tell. 'My God, don't arrest me, I was just protecting myself. It was self-defense.' Did you say that to those policemen?

"MR. LEVIN: Objection again, Your Honor.

"A. No. I was going to be held as a suspect whether I told them or not.

"Q. Okay. Now some time later two officers from the Fremont Police Department came to the Perkins Township Police Department for the purpose of transporting you back to Fremont, didn't they?

"A. Yes.

"Q. And so you rode in a cruiser with two Fremont policemen from Perkins Township back to Fremont, is that correct?

"A. Yes.

"* * *

"Q. During that half hour ride did you ever once say to those Fremont policemen 'My God, the guy was going to shoot me. I was shooting in self-defense. Go —'

"MR. LEVIN: Objection.

"Q. '— out there on the scene and look for a gun.'

"MR. LEVIN: Objection.

"Q. Did you say anything like that to those police officers?

"MR. LEVIN: Objection.

"THE COURT: Overruled.

"A. I didn't want to talk about it until I got a lawyer."

On redirect examination, appellant testified, in part:

"Q. Now the Prosecutor made a big to do about you didn't tell the police. Didn't the police tell you you had a right to remain silent? Didn't they tell you that? Didn't they tell you you had a right to talk to a lawyer? Didn't they tell you that?

"A. Yes."

In his closing argument to the jury, the prosecutor made the following statements:

"You do remember that the Defendant testified in response to direct examination from his own attorney that he was on his way to Sandusky to tell his mother, and then he was going to call the police. Well, he never got to Sandusky, but he got to some police. He got to the Perkins Township Police, who arrested him, told him what they were arresting him for. He said nothing.

"MR. LEVIN: Objection.

"THE COURT: Overruled. That objection is in the record, Mr. Levin.

"He later was picked up by two Fremont police to be transported back to Fremont. Now it's true that the Perkins Township Police and the Fremont Police advised him of his rights, his *Miranda* Warnings. You don't have to talk. And that is absolutely true. You don't have to

talk. So what's reasonable? What's reasonable? If you have been in the position that this man is in and you know that you are now, and the police are telling you, going to be charged with the crime, what do you do? You say, 'My God, man, I was protecting myself. I was defending myself. This guy had a five, six inch gun. It's silver. Go look for it.' "

At this point, defense counsel interposed a standing objection to any further comment on appellant's post-*Miranda* warning silence. The prosecutor continued:

"Go look for the gun Officers. This man was going to shoot me. Talk to these people. These people have told me in the last five days that he's going to kill me. Here's a list of the people. Go talk to these people. They'll tell you that he's been threatening me. He didn't do any of that. He didn't do anything. He didn't do anything because none of that's true."

## I

Although the facts and law relevant to the disposition of the first and second assignments of error are interrelated, we will first address the issue of appellant's post-*Miranda* warning silence. In so proceeding, we begin by reviewing the most recent progeny of *Doyle* v. *Ohio* (1976), 426 U.S. 610.

## A

In *Fletcher* v. *Weir* (1982), 455 U.S. 603, a fight had occurred in a nightclub parking lot which resulted in the death of one of the combatants. The defendant fled the scene, but was arrested a short time later. At trial, he admitted the facts of the altercation, but claimed that he acted in self-defense and that the killing was accidental. These in-court statements were the first time the defendant had offered any exculpatory explanation. The prosecution, on cross-examination, inquired into why, after his arrest, the defendant had failed to tell police his self-defense version of the killing. The defendant was subsequently convicted of manslaughter, which he appealed. The Supreme Court found *Doyle* v. *Ohio* inapplicable because "the record * * * [did] *not* indicate that * * * [the defendant] received any *Miranda* warnings during the period in which he remained silent immediately after his arrest." (Emphasis added.) *Fletcher* v. *Weir, supra,* at 605. The Supreme Court grounded its ruling in *Fletcher* squarely on the facts, holding at 607:

"*In the absence of the sort of affirmative assurances embodied in the Miranda warnings,* we do not believe that it violates due process of law for a State to permit cross-examination as to postarrest silence when a defendant chooses to take the stand." (Emphasis added.)

The facts of the case *sub judice* suffice to distinguish the holding in *Fletcher,* for here we face no similar difficulty in determining when, or if, appellant received *Miranda* warnings. Yet, the import of the *Fletcher* holding is clear. The correct analysis focuses not upon muddled notions of "pre"-arrest versus "post"-arrest silence, but rather upon whether a criminal defendant's silence occurred *before or after* his receipt of the *Miranda* warnings. See *Miranda* v. *Arizona* (1966), 384 U.S. 436.

In *Doyle* v. *Ohio,* the defendant was given the *Miranda* warnings when arrested for selling marijuana to a police informant. He chose to remain silent. At trial, he testified that he was the victim of a "frame-up" by narcotics agents. On cross-examination, and for impeachment purposes, the prosecutor was permitted to ask the defendant why he had not revealed this exculpatory explanation to the arresting officer.

In holding that this use of the defendant's silence, after receiving the *Miranda* warnings, was constitutionally impermissible, the Supreme Court stated at 617-618:

"Silence in the wake of these warnings may be nothing more than the arrestee's exercise of * * * [his] *Miranda* rights. Thus, every post-arrest silence is

insolubly ambiguous because of what the State is required to advise the person arrested. * * * In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial."

Later in the *Doyle* opinion, at 619, fn. 10, the court supplemented the foregoing view by stating:

"After an arrested person is formally advised by an officer of the law that he has a right to remain silent, the unfairness occurs when the prosecution, in the presence of the jury, is allowed to undertake impeachment on the basis of what may be the exercise of that right."

In an earlier case, *United States* v. *Hale* (1975), 422 U.S. 171, the Supreme Court, in exercising its supervisory powers over federal courts, held that a defendant's "silence during police interrogation lack[s] significant probative value and * * * any reference to his silence under such circumstances carr[ies] with it an intolerably prejudicial impact." *Id.* at 180. See, also, *id.* at 182-183 (White, J., concurring).

In *Doyle,* the Supreme Court found that due process of law required application of this prohibition to state criminal trials. Confirming the premise underlying the *Hale* decision, the *Doyle* court, at 618, fn. 8, noted that "silence at the time of arrest [is] likely to be ambiguous and thus of dubious probative value." See, also, *Fletcher* v. *Weir, supra,* at 604-605.

In the instant case, the state argues that once appellant "opened the door" through his statements on direct examination, the prosecution then had the right to use, as a basis for impeaching appellant's credibility and veracity, his silence following the *Miranda* warnings. The state also asserts that cross-examination into appellant's post-*Miranda* warning silence, even if it was error, was merely "cumulative" in nature, and therefore innocuous. We find no merit in these con-

tentions, and for reasons based on federal and Ohio decisions, we reject the state's position.

The state has premised its theory on the assumption that appellant's post-*Miranda* warning silence was patently inconsistent with his exculpatory testimony. Accepting, *arguendo,* the correctness of this assumption, his silence is then asserted to be a form of prior "statement," which, by analogy, is subject to traditional rules governing impeachment of a witness's trial testimony through the use of prior inconsistent statements.

## B

Traditional rules of evidence assumed that "human nature prompts an innocent man to deny false accusations and consequently a failure to deny a particular accusation tends to prove belief in * * * [its] truth." McCormick, Evidence (2 Ed. Cleary Ed. 1972) 353, Section 161. Yet, decisional law under the Fifth and Fourteenth Amendments appears to have steadily eroded the basis for this assumption. Significantly more plausible is the proposition that, after receiving *Miranda* warnings and while in police custody, an individual's silence is prompted by a quite rational fear of incriminating himself by speaking. Cf. *Roberts* v. *United States* (1980), 445 U.S. 552, 560-561; see, also, *United States* v. *Hale, supra,* at 177. Even so, traditional rules had stringent foundational requirements for the admissibility of pretrial silence, whether as evidence of prior inconsistent conduct or as substantive evidence of guilt.

Common-law strictures held silence in the face of accusation admissible for impeachment use only if, in light of the circumstances in which the accusation was made, a reply was naturally forthcoming or it would be reasonable to expect a denial if the accusatory statement were not true. 3A Wigmore, Evidence (Chadbourn Rev., 1970), Section 1042; cf. 4 Wigmore, Evidence (Chadbourn Rev.

1972), Section 1072; McCormick, *supra*, at 652, Section 270. The prior silence must have been such as to amount to an unambiguous acquiescence in, or assent to, the accusatory statement. *Id.* Moreover, a statement made in the presence of a party heard and understood by him, to which he could have responded, but did not, is frequently cited as a pristine instance of a tacit admission. 4 Wigmore, *supra*, at 102, Section 1071, and at 116-118, Section 1072.

Impeachment was similarly permitted by reference to a person's previous *failure to assert a fact* under circumstances in which it would have been natural for him to do so. 3A Wigmore, *supra*, at 1056-1058, Section 1042; McCormick, *supra*, at 353, Section 161; cf. *Jenkins* v. *Anderson* (1980), 447 U.S. 231, 239. Yet, the common-law rules also required that foundational prerequisites be satisfied before introducing the fact of silence to the jury. Among these was an affirmative showing by the proponent that the defendant, in remaining silent or in failing to contradict the accusatory statement, thereby unequivocally manifested his assent to it because he had been called upon to speak, it was natural for him to do so and he had a motive for responding. 3A Wigmore, *supra*, at 1058, Section 1042; 4 Wigmore, *supra*, at 102, 106, Section 1071, and at 116-118, Section 1072. Silence was not admissible absent conformity with these prerequisites.

## C

Ohio law is generally consonant with these common-law principles. Moreover, the Ohio Rules of Evidence do not clearly indicate an intention to depart from common-law decisions in this state. See Evid. R. 102. To determine the admissibility of a defendant's silence, a court is required to examine with the utmost scrutiny all of the facts and circumstances under which the defendant remained silent when confronted with an accusatory statement. Furthermore, Ohio law

has carefully distinguished between two *uses* of prior silence. As with most admissibility issues, the decisive consideration in determining whether to admit or to exclude such evidence is the *purpose* for which it is being offered. In cases like the present one, prior silence may be offered to impeach a defendant's direct testimony as it bears on his credibility or veracity. In other Ohio cases, all of them predating *Miranda* v. *Arizona,* the defendant's silence could be received against him as an "admission." This admission-by-silence rule was merely a derivative of the traditional adoptive admission or admission by acquiescence. If admitted in evidence, the jury could then consider the defendant's silence as *substantive* evidence of his guilt. *Murphy* v. *State* (1881), 36 Ohio St. 628, 630-631; *Hoover* v. *State* (1914), 91 Ohio St. 41, 47-49; see, also, *Haberty* v. *State* (1894), 8 Ohio C.C. 262.

Today, of course, the *Miranda* decision precludes the *substantive* use of a defendant's silence during police interrogation to prove his guilt. *Miranda* v. *Arizona, supra,* at 468, fn. 37. Yet, even before the *Miranda* decision, trial courts in Ohio were required to use extreme caution when the prosecution offered what was purportedly a defendant's admission by silent assent. "It is not every instance of silence in the hearing of accusation that renders it admissible, as admitting guilt." See *Geiger* v. *State* (1904), 70 Ohio St. 400, 413, 414-419; *Zeller* v. *State* (1931), 123 Ohio St. 519, 523; see, also, *Rose* v. *State* (1896), 13 Ohio C.C. 342, affirmed without opinion (1897), 56 Ohio St. 779; cf. *Walker* v. *State* (1930), 37 Ohio App. 540, 542-543. The principal criterion for admission was the *naturalness* and *reasonableness, under the circumstances,* of inferring from a defendant's silence his assent to the truth of the accusation. Unless the evidence established that, under the circumstances, the statement was of the kind naturally and reasonably demanding a response, the defendant's

silence was excluded. *Hoover* v. *State, supra; Geiger* v. *State, supra; Zeller* v. *State, supra.*

Ohio evidentiary law has also recognized the rule permitting impeachment through use of a defendant's prior statements or prior *conduct* inconsistent with his present statements at trial. In *Dilcher* v. *State* (1883), 39 Ohio St. 130, the Ohio Supreme Court ruled that evidence of pretrial conduct inconsistent with present testimony as to a material matter was admissible for impeachment purposes. Logically, of course, such conduct could encompass a defendant's prior silence. In the fourth paragraph of the syllabus, the *Dilcher* court held:

"Where the foundation is laid for contradicting a witness, by * * * [out-of-court conduct] inconsistent with his testimony upon a material matter, and such conduct * * * is susceptible of different meanings, one of which would be inconsistent with the truth of such testimony, it is admissible in evidence, leaving the jury to determine which is the true meaning, and to exclude such evidence is error."

The *Dilcher* court intimated that the proponent of the impeaching evidence must initially show that the prior conduct sought to be admitted is genuinely contradictory to in-court testimony, thereby establishing a *threshold inconsistency* between the two. Accord *United States* v. *Hale, supra,* at 176. Presumably, if this foundational requirement were met, the prior inconsistent conduct would be received as impeaching evidence, and the question of veracity would go to the jury. *Dilcher, supra,* at 136.

We have some doubt whether the prosecution in the case *sub judice* actually established, or even attempted to establish, a threshold inconsistency between appellant's post-*Miranda* warning silence and his exculpatory testimony. Nonetheless, the *Dilcher* holding has been circumscribed so severely by the constitutionalization of criminal procedure in recent times, and, in particular, by *Doyle* v. *Ohio,* that it has little, if any, continuing vitality in the present context.[1] Indeed, the *Miranda* warnings are not something easily harmonized with any traditional suppositions underlying impeachment by use of prior silence. The warnings ostensibly leave an accused with a free choice " 'to admit, to deny, or to refuse to answer.' " *Garner* v. *United States* (1976), 424 U.S. 648, 657. Consequently, the warnings have the effect of throwing a monkey wrench into the inferential underpinnings of common-law impeachment doctrine, of which the *Dilcher* holding is an example. Once a police officer delivers the warnings to an arrestee in the substance that *Miranda* requires, it is not the least bit natural for him to respond to, or assert, anything. Nor is it reasonable to expect that he should do so. There is, in fact, every reason to believe that the warnings operate as a deterrent to volunteered statements, and, of course, an accused is under no duty to speak. Accord *United States* v. *Hale, supra,* 176-177. Thus, because of what an accused is required to be told, post-*Miranda* warning silence is "insolubly ambiguous." *Doyle* v. *Ohio, supra,* at 617. Ambiguity abounds precisely because post-arrest

---

[1] We do not dispute the well-established rule that in voluntarily taking the stand and testifying in his own behalf, appellant thereby waived *at trial* any right to object to unfavorable cross-examination on the basis that it might tend to embarrass, impeach or incriminate him. Appellant could be thoroughly and properly cross-examined as to matters impeaching his credibility as with any other witness. *Sabo* v. *State* (1928), 119 Ohio St. 231; cf. *Grunewald* v. *United States* (1957), 353 U.S. 391, 420. However, we reject the suggestion, for which there is no support, that in electing to testify appellant waived retroactively any *prior* assertion of his privilege of silence under police interrogation so as to be precluded from objecting to cross-examination thereon. Such a theory would be plainly inconsistent with the rationale of *Doyle* v. *Ohio.*

silence may be induced by the assurances contained in the *Miranda* warnings. *Roberts* v. *United States, supra,* at 561; see, also, *State* v. *Williams* (1979), 64 Ohio App. 2d 271 [18 O.O.3d 262].

### D

The facts of this case persuade us that any ambiguities militate in favor of appellant. Two of appellant's responses to the prosecutor's questions about his prior silence are particularly compelling. First, appellant stated: "I was going to be held as a suspect whether I told them [the police] or not." At a later point under cross-examination, appellant stated, in response to a question directed to his post-*Miranda* warning silence: "I didn't want to talk about it [the shooting] until I got a lawyer." The probability is substantial that appellant heeded the warning that he had the right to remain silent and the right to consult with an attorney prior to any interrogation. His responses on cross-examination suggest as much.

Moreover, having been advised of his *Miranda* rights not once, but twice, appellant's "failure" to tell police he shot Williams in self-defense is more likely attributable to an acute awareness of and reliance on these rights than to an intent to fabricate exculpatory testimony.[2]

Beyond the fact that post-*Miranda* warning silence is rife with ambiguity, *Doyle's* progeny suggest that the warnings carry with them an implied promise that a defendant's decision to remain silent will not be turned against him at trial. *Anderson* v. *Charles* (1980), 447 U.S. 404, 407-408; *Jenkins* v. *Anderson, supra,* at 239-240; *Fletcher* v. *Weir, supra,* at 606. Consequently, it would be fundamentally unfair and a denial of due process to break that promise. *Doyle* v. *Ohio, supra,* at 618.

### E

Finally, we cannot ignore the prejudicial impact that the use of a defendant's post-*Miranda* warning silence is virtually

---

[2] Of course, a criminal defendant has no constitutional right to take the stand and foist perjury on the jury. *Oregon* v. *Hass* (1975), 420 U.S. 714, 721-723; *Harris* v. *New York* (1971), 401 U.S. 222, 225-226; cf. *State* v. *Osborne* (1977), 50 Ohio St. 2d 211, 216 [4 O.O.3d 406]. In *Harris* v. *New York* the Supreme Court upheld the use of a defendant's statements to police, even though obtained in violation of *Miranda,* to impeach his credibility as to later statements made during direct testimony at trial. In so ruling, the court stated at 226:

"The shield provided by *Miranda* cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with *prior inconsistent utterances.* * * * [The defendant's] credibility was appropriately impeached by use of his earlier conflicting statements." (Emphasis added.)

However, the line of cases represented by *Harris* v. *New York* is distinguishable precisely because the cases involve reference to prior extrajudicial *statements* made after arrest. In the case *sub judice,* the prosecutor introduced for impeachment purposes, *not* a prior affirmative statement, but rather the fact that ap-

pellant *told the police nothing* when he was arrested, given the *Miranda* warnings and questioned. In *Anderson* v. *Charles* (1980), 447 U.S. 404, the court at 408 elaborated on the significance of this distinction:

"*Doyle* does not apply to cross-examination that merely inquires into *prior inconsistent statements.* Such questioning makes no unfair use of silence, because a defendant who *voluntarily speaks* after receiving *Miranda* warnings has not been induced to remain silent. As to the subject matter of his statements, the defendant has not remained silent at all." (Emphasis added.) See, also, *State* v. *Osborne, supra.*

Here, appellant made no statements to police after receiving the *Miranda* warnings. Nor did he claim to have made any during his direct examination. See *Doyle* v. *Ohio, supra,* at 619, fn. 11. The prosecutor's questions were not directed toward eliciting an explanation for a prior inconsistent statement to police, but toward producing by insinuations an unfavorable inference on the import of appellant's silence. This is exactly what we read the rule in *Doyle* to forbid.

certain to have on the jury. References to prior silence in the presence of the jury inevitably precipitate the impermissible inference that a failure to deny an accusation of guilt, or assert its contrary, is an admission of the accusation's truth. Cf. *State* v. *Fields* (1973), 35 Ohio App. 2d 140, 144-146 [64 O.O.2d 248]. Needless to say, the inference is an extremely tenuous one since there are frequently competing, equally plausible explanations for a defendant's silence at the time of his arrest. Some of these may be quite consistent with his innocence. Not insignificantly, even *before* he receives any warnings, a variety of factors may prompt an accused's refusal to speak. Fear, confusion, lack of familiar surroundings and people, or friends, in whom he might confide, are perhaps the more obvious. Advising an accused of his *Miranda* rights merely provides one more factor inducing him to remain silent. In *State* v. *Stephens* (1970), 24 Ohio St. 2d 76 [53 O.O.2d 182], the Ohio Supreme Court at 81 alluded to another possible explanation for a defendant's post-*Miranda* warning silence:

"[After his arrest,] it is not uncommon [for an accused] to react by refusing to discuss the charges until a lawyer can be retained. Desire for friendly counsel and advice can be a major motivation at that time in the mind of one completely innocent of the charges, as well as one who subsequently may admit his guilt.

"His privilege at that time is silence. * * * [He] should not thereafter be penalized for his original refusal."

Or, it may be that an accused simply heeds the warning that *"anything you say* can and will be *used against you* in a court of law." Thus, to even suggest by way of cross-examination that a defendant's prior silence is somehow unfavorable to him at trial, or that it is inconsistent with innocence, is to invite prejudicial misuse through jury speculation on the import of such silence. This danger is only aggravated by the fact that juries are notoriously incapable of segregating from substantive evidence of guilt, the evidence or testimony admitted *only* for its *impeachment* value, even when they receive a specific instruction to that effect. Where post-arrest silence is the impeaching evidence, its prejudicial attributes are all too apparent.

In the *Miranda* opinion, the court at 468, fn. 37, stated the prohibition thusly:

"[I]t is impermissible to penalize an individual for exercising his Fifth Amendment privilege when he is under police custodial interrogation. The prosecution *may not*, therefore, *use* at trial the fact that he stood mute or claimed his privilege in the face of accusation." (Emphasis added.)

Were it otherwise, the right not to incriminate oneself could be asserted only at a prohibitive cost. Furthermore, in *Doyle* v. *Ohio*, even the dissenters conceded that prosecutorial *comment* on the fact that the defendant had exercised his right to remain silent, after receiving *Miranda* warnings, "overstepped permissible bounds." *Id.* at 633. In his dissenting opinion, at 634-635, Justice Stevens stated:

"Comment on the lack of credibility of the defendant is plainly proper; it is not proper, however, for the prosecutor to ask the jury to draw a direct inference of guilt from silence — to argue, in effect, that silence is inconsistent with innocence."

The logic of this view is fully accordant with the oft-quoted precept that "silence in the face of accusation is itself damning and will bode ill when presented to a jury." *Miranda* v. *Arizona, supra,* at 468.

We thus conclude that it was violative of due process of law under the Fourteenth Amendment to the federal Constitution for the trial court to allow the prosecution to use for impeachment purposes and in summation the fact that appellant

remained silent following his receipt of the *Miranda* warnings.[3] *Doyle* v. *Ohio, supra;* see, also, *United States* v. *Williams* (C.A. 6, 1981), 665 F. 2d 107; *State* v. *Williams, supra.* It is fundamentally unfair to permit inquiry into, and comment upon, the silence which the warnings may well have encouraged.

We further conclude that the same use of appellant's post-*Miranda* warning silence unconstitutionally impinged upon his privilege against compelled self-incrimination under Section 10, Article I of the Ohio Constitution. The trial court should have prohibited *any* reference by the prosecutor to appellant's post-*Miranda* warning silence, whether in cross-examination or during summation. Cf. *State* v. *Perryman* (1978), 49 Ohio St. 2d 14, 20-21 [3 O.O.3d 8], vacated on other grounds (1978), 438 U.S. 911. Its failure to do so was error prejudicial to appellant, and reversal is required. See *State* v. *Eiding* (1978), 57 Ohio App. 2d 111 [11 O.O.3d 113]; *State* v. *Williams, supra;* accord *State* v. *Liberatore* (1982), 69 Ohio St. 2d 583 [23 O.O.3d 489].

In reversing appellant's conviction, we give significant weight to the fact that this case was tried to a jury, rather than to the court. *State* v. *Eubank* (1979), 60 Ohio St. 2d 183, 187 [14 O.O.3d 416]. We cannot say that had cross-examination and comment upon appellant's post-*Miranda* warning silence not been erroneously admitted, the jury would nonetheless have reached the same conclusion and found him guilty of the offense charged. Hence, we find that the error was not harmless beyond a reasonable doubt. *Chapman* v. *California* (1967), 386 U.S. 18. Appellant was not entitled to a perfect, error-free trial, but he was entitled to a fair one. *State* v. *Kehn* (1977), 50 Ohio

St. 2d 11, 20 [4 O.O.3d 74]; *State* v. *Dutton Drugs, Inc.* (1965), 3 Ohio App. 2d 118, 125-126 [32 O.O.2d 204].

We acknowledge that wide latitude should be afforded prosecutors during their closing arguments to the jury. *State* v. *Brand* (1978), 56 Ohio App. 2d 271, 272-273 [10 O.O.3d 281]; *State* v. *Stephens, supra,* at 82. In future cases, however, prosecutors *must* scrupulously avoid *any* suggestion to the jury that a defendant is guilty because he refused to volunteer a statement to the police. See *State* v. *Williams, supra,* at 276. The right to remain silent is rendered largely valueless if a person can be penalized for exercising it. Accord *Grunewald* v. *United States* (1957), 353 U.S. 391, concurring opinion at 425.

Therefore, appellant's first assignment of error is well-taken. Having thus disposed of the first assignment of error, we find that appellant's third assignment of error is now rendered moot and is, for that reason, not well-taken.

## II

### A

We now address the issue of appellant's pre-arrest silence. The state argues that appellant's direct testimony as to his conduct immediately *after* the shooting, but *before* his arrest, "opened the door" for the prosecutor to attack his credibility by reference to such nonverbal conduct. The trial court also stated as much in its judgment entry dated April 29, 1982:.

"[T]he defendant testified, on direct examination, that when he left the scene of the murder, he intended to go to police.

"The prosecutor, in cross-examination, then asked him if he did tell the police, when he was arrested about an hour later, about the incident.

---

[3] The contrary holdings of pre-*Doyle* cases, such as *State* v. *Young* (1971), 27 Ohio St. 2d 310 [56 O.O.2d 182], vacated on other grounds (1972), 408 U.S. 940, and *State* v. *Laskey* (1970), 21 Ohio St. 2d 187 [50 O.O.2d 432], vacated on other grounds (1972), 408 U.S. 936, appear to have no continuing vitality insofar as they directly conflict with the rule announced in the *Doyle* opinion.

"The court finds such cross-examination and comment in closing argument was therefore not improper, as, to use the old cliche, 'the defendant opened the door, and the prosecution was then permitted to walk in.' "

The state urges, and appellant concedes, that the United States Supreme Court's decision in *Jenkins* v. *Anderson, supra,* clearly leaves each state free to determine the admissibility of pre-arrest silence under its own rules of evidence. In *Jenkins,* the Supreme Court held that the Fifth Amendment was not violated by the use of *pre-arrest* silence to impeach a criminal defendant's credibility. In rejecting the additional claim that such use of pre-arrest silence impinged upon due process of law, the court stated at 239-240:

"Each jurisdiction may formulate its own rules of evidence to determine when prior silence is so inconsistent with present statements that impeachment by reference to such silence is probative. * * * [N]o governmental action induced [the defendant] to remain silent before arrest. The failure to speak occurred before * * * [the defendant] was taken into custody and given *Miranda* warnings. Consequently, the fundamental unfairness present in *Doyle* [v. *Ohio*] is not present in this case."

Yet, the Supreme Court also cautioned:

"Our decision today does not force any state court to allow impeachment through the use of prearrest silence. Each jurisdiction remains free to formulate evidentiary rules defining the situations in which silence is viewed as more probative than prejudicial." *Id.* at 240.

The most salient fact of consequence in the *Jenkins* decision was that the defendant waited for *two weeks* after the incident in which he stabbed and killed a man before surrendering to police. In the case *sub judice,* appellant was apprehended by police shortly after he shot Williams. The record indicates that appellant arrived at the Stark residence at

approximately 2:30 p.m. The record does not reveal the exact length of time he remained there, but it does show that Perkins Township Police arrested him at about 3:30 p.m.

We will not quibble over the difference in tenor, if any, between the trial court's interpretation that appellant said he "intended to go to police" and his actual trial testimony that he was "going to tell * * * [his] mother and then call the police." Suffice it to say that his in-court statement was merely a statement of intention, not a statement contradicting a prior, extrajudicial one. Notwithstanding this determination, the prosecutor's cross-examination cannot be so easily bifurcated into distinct segments of pre-arrest silence and post-*Miranda* warning silence. Having found that federal and Ohio constitutional limitations prohibit the use of appellant's post-*Miranda* warning silence, the only issue to resolve in this assignment is whether any Ohio evidentiary rule precluded the admission of appellant's *pre-arrest* silence for impeachment purposes.

Evid. R. 403 states in part:

"(A) Exclusion mandatory. Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury."

Simply stated, Evid. R. 403(A) establishes a mandatory rule of exclusion for relevant evidence, the probative value of which is substantially outweighed by the danger of unfair prejudice of the jury. This formulation of the rule is not a significant departure from prior Ohio law. See *State* v. *Strodes* (1976), 48 Ohio St. 2d 113, 116 [2 O.O.3d 271], vacated on other grounds (1978), 438 U.S. 911; *State* v. *Smith* (1976), 50 Ohio App. 2d 183, 197 [4 O.O.3d 160]. Cf. *State* v. *Davis* (1980), 70 Ohio App. 2d 48, 51 [24 O.O.3d 42].

The facts of this case convince us that appellant's pre-arrest "silence" of approximately forty-five minutes is not

similarly as probative of credibility or recent fabrication as was the *two weeks* of silence that preceded the defendant's arrest in *Jenkins* v. *Anderson*. The temporal proximity of appellant's arrest and the act precipitating it were simply too close to make his "silence" sufficiently probative of an inconsistency with his in-court testimony to warrant cross-examination thereon. Moreover, the prejudicial aspects inherent in the use of appellant's pre-arrest conduct as "silence" are indeed plain. The same dangers of prejudicial jury misuse identified with post-*Miranda* warning silence exist with equal force in the context of pre-arrest silence. The potential for prejudice was merely exacerbated in view of the negligible amount of time that elapsed between the shooting and appellant's arrest by Perkins Township Police. Appellant testified that he left Fremont because he was scared and feared reprisal if he remained. His failure to volunteer an exculpatory statement to a police officer during the forty-five minutes or so preceding his arrest is attributable to other quite innocent reasons having nothing whatsoever to do with the truth or falsity of his trial testimony. One such reason may have been the very compelling instinct for self-preservation. Another reason may have been a feeling that any effort to exonerate himself by returning to Fremont would have only been futile or, possibly, worsened his situation. As we alluded to earlier, a jury is not necessarily amenable or sensitive to alternative explanations for the kind of pre-arrest "silence" exhibited here. Moreover, it would strain credulity to insinuate, by reference to that silence, that appellant was under a legal duty to inculpate himself in the presence of the nearest law enforcement authorities. Consequently, the prejudicial impact of using appellant's pre-arrest silence to impeach his credibility substantially outweighed its probative worth which, on these facts, was so low as to be minimal. In the context of this case and its facts, evidence of or reference to appellant's pre-arrest silence for purposes of impeachment, being substantially more prejudicial than probative, should have been excluded. Evid. R. 403(A), *supra*. The trial court's failure to do so was prejudicial error.

### B

Persuasively reasoned authority supports the proposition that *all* pretrial silence is usually so prejudicial in disproportion to its probative worth that exclusion is warranted in all but exceptional cases. See *People* v. *Conyers* (1981), 52 N.Y. 2d 454, 438 N.Y. Supp. 2d 741, 420 N. E. 2d 933. We decline to follow those jurisdictions which have adopted a *per se* (or similarly stringent) rule barring the impeachment use of defendant's pre-arrest silence. *Id.*

The better rule is for the trial court to determine, on a case-by-case basis, the precise circumstances under which a defendant's pre-arrest silence, when juxtaposed to his exculpatory testimony, is so genuinely inconsistent with it that references to such silence are probative of credibility or recent fabrication. Cf. *Commonwealth* v. *Nickerson* (1982), 386 Mass. 54, 434 N. E. 2d 992, 995, 997. In determining when pre-arrest silence is more probative than prejudicial, the court must look to factors such as the duration or length of time elapsing between a defendant's arrest and the offense precipitating it. If there has been a substantial period of pre-arrest "silence," then impeachment by reference to such silence is permissible as being probative of credibility if, *under the circumstances*, it would have been *natural and reasonable* to expect the defendant to initiate some kind of exculpatory communication to the police during that period. *Jenkins*-type silence, that is, a failure to assert innocence for a period of two weeks or more, would, in our view, fall well within the meaning of a "substantial" period of time. Here, appellant's forty-five minutes of pre-arrest silence did not. The court must, of course,

always determine, in a given case, whether the probative worth of pre-arrest silence is substantially outweighed by the danger of unfair prejudice of the jury. Evid. R. 403(A). If the likelihood of unfair prejudice substantially outweighs the probative attributes of pre-arrest silence, as it did in this case, then all references to such silence *must* be excluded.

Therefore, appellant's second assignment of error is well-taken. * * *■

### III

Appellant's fourth assignment of error is:

"IV. The trial court erred in overruling appellant's motion in arrest of judgment and motion to dismiss indictment in that the indictment upon which the judgment of conviction was based is invalid and void and thus appellant was denied his constitutional rights afforded under Article I, Section 10 of the Constitution of the state of Ohio and the trial court was without jurisdiction to enter such judgment of conviction."

Appellant urges that because the indictment in this case was signed by the assistant prosecutor, rather than by the county prosecutor (Mr. Mayle), or in his name, it was rendered fatally defective and void as a matter of law.

Section 10, Article I of the Ohio Constitution states in pertinent part:

"[N]o person shall be held to answer for a * * * crime, unless on presentment or indictment of a grand jury."

Nowhere in the above-quoted section is there any constitutional requirement as to the manner in which an indictment is to be authenticated or by whom. However, the crux of appellant's objection to the validity of this indictment is found in Crim. R. 7(B), which provides in relevant part:

"The indictment * * * shall be signed by the prosecuting attorney or signed in his name by an assistant prosecuting attorney[.]"

Crim. R. 2 states in pertinent part:

"As used in these rules: * * *

" 'Prosecuting attorney' means * * * the prosecuting attorney of a county * * * and the assistant or assistants of any of them. As used in Rule 6 [governing procedure in cases before the grand jury], 'prosecuting attorney' means * * * the prosecuting attorney of a county, and the assistant or assistants of either of them."

However, R.C. 2941.08 states in part:

"An indictment * * * is not made invalid, and the * * * judgment, or other proceedings stayed, arrested, or affected:

"* * *

"(K) For * * * defects or imperfections which do not tend to prejudice the substantial rights of the defendant upon the merits."

The fact that the assistant prosecutor signed this indictment detracted not at all from its sufficiency as a matter of law. If the signature on the indictment could reasonably be said to carry the imprimatur of the county prosecutor, then the mere absence of *his* signature did not violate any of appellant's constitutional rights or otherwise infringe upon any of his substantial rights on the merits of this case. *State* v. *Stone* (1971), 30 Ohio App. 2d 49, 55-56 [59 O.O.2d 115]; *State* v. *Turpin* (1969), 19 Ohio App. 2d 116, 122 [48 O.O.2d 236]; *State* v. *Whitt* (1964), 3 Ohio App. 2d 278, 282 [32 O.O.2d 382]. Accordingly, the fourth assignment of error is, therefore, not well-taken.

### IV

#### A

Appellant's fifth and sixth assignments of error are:

"V. The trial court erred in returning the jury for further deliberations after the jury informed the court in writing that they felt there was insufficient evidence upon which to base a judgment and that the jury did not feel it could be fair in

either verdict and after the jury disclosed its deliberation status as being six votes for conviction and six votes for acquital [*sic*].

"VI . In view of the jury's insistence that it could not reach a fair verdict at the trial of this matter, the trial judge erred in failing to question the jury during the polling of the jury as to whether each juror was voting his convictions or whether he was voting contrary to his conviction so as just to reach a verdict in response to the trial court's remarks."

The record discloses that jury deliberations began at approximately 5:45 p.m. Forty-five minutes later the jury requested that the trial court reread the instructions of law pertaining to self-defense, which the court then did. The jury returned to its deliberations, and, at 9:15 p.m., it submitted a note to the court, which stated:

"After two votes we are deadlocked at six and six. We feel that the case has been bungled by both the police, defense, the prosecutor's office; that we have insufficient evidence upon which to base a judgment. There are too many loopholes in both sides of the evidence. We do not feel we could be fair in either verdict."

After reading the note into the record, the trial court stated:

"Now ladies and gentlemen, there is no more evidence that can be presented to you. Both sides have presented what they felt was the relevant evidence in the case.

"And presumably this Jury, a good hardworking Jury, can reach a verdict if any jury can.

"I would like you to go back and to discuss and decide whether or not you feel with more time — not necessarily tonight — it could be either tomorrow or Monday — there would be a likelihood of reaching a verdict. And, of course, you realize a verdict must be unanimous, twelve. And then please report back to the Court what your position is.

"Will you do that for me, please? Thank you."

At approximately 11:00 p.m., the jury returned a verdict of guilty.

Appellant argues that the trial court should have, *sua sponte*, declared a mistrial and discharged the jury upon receiving the above-quoted note. He contends that the trial court, in effect, force-marched the jury to a guilty verdict by insisting that "this Jury * * * can reach a verdict if any jury can." * * *

R.C. 2945.36 sets forth four grounds upon which to discharge a jury in a criminal case. There has been some suggestion that these causes for discharge are permissive rather than exclusive. See *State* v. *Workman* (1977), 60 Ohio App. 2d 204, 208 [14 O.O.3d 181]. R.C. 2945.36 states, in pertinent part:

"The trial court may discharge a jury without prejudice to the prosecution:

"* * *

"(B) Because there is no probability of such jurors agreeing; * * *"

In the instant case, after receiving the jury's note, the trial court asked the jury to decide whether there was a likelihood of reaching a verdict, informing them also that deliberations could extend over several days. As a general proposition, the law certainly encourages jurors to agree rather than deadlock, and urging a jury to make every reasonable effort to reach a verdict is not improper. *Liska* v. *State* (1926), 115 Ohio St. 283, 285; *State* v. *Swanson* (1967), 9 Ohio App. 2d 60, 66 [38 O.O.2d 63]; see, also, 27 Ohio Jurisprudence 3d (1981) 300, Discharge of Jury, Section 1039.

However, the facts here are indeed unique. The jury's note to the trial court revealed more than simply a difficulty in arriving at a verdict. This was *not* a case where the intransigence of a single juror frustrated the unanimity of a verdict. Reasonable doubt was clearly pervasive in the minds of six members of the jury. Standing alone, this fact should have alerted the trial court that it faced circumstances ladened with coercive potential. Juries generally do not and, of

course, should not, disclose the status of their deliberations in messages to the court. Second, the jury declared that it had insufficient evidence upon which to base a verdict. It then substantiated its collective opinion of the evidence with the statement that "there are too many loopholes in both sides of the evidence." Finally, the jurors clearly and explicitly announced that any verdict they might reach would not be fair. No leap of faith is needed to see that any subsequent verdict thus rendered would be, by their own protestations, an *unfair* one.

We feel the trial court genuinely *intended* only to urge agreement. Yet, its *statements* prejudicially intimated to the jurors that they should unanimously agree upon a verdict *despite* their expressed inability to decide the case fairly. Sending the jury back for further discussion or deliberation could only be taken by it as a signal that a unanimous verdict was the overriding consideration, regardless of fairness or the jurors' own perceptions of the case. No doubt the displeasing prospect of carrying deliberations over a weekend provided additional impetus to reach a quick consensus.

Moreover, the trial court's statements lacked the balance and proper cautionary language necessary to avoid the pernicious results for which the so-called "*Allen* charge" has been criticized and, in Ohio, rejected. *State* v. *Maupin* (1975), 42 Ohio St. 2d 473, 484, 482-487 [71 O.O.2d 485]; *Allen* v. *United States* (1896), 164 U.S. 492, 501. In *State* v. *Maupin, supra,* the Ohio Supreme Court, in the fourth paragraph of the syllabus, held:

"The giving of a neutral supplemental instruction, urging the jury to attempt to reach a verdict, upon notification by the jury to the court that it was having difficulty reaching an agreement after deliberations of two hours and twenty-nine minutes, *with no other circumstance present with the potential of coercion of the jury,* is not *an abuse of discretion.*" (Emphasis added.)

The jury's explicit, unequivocal indication (1) that it was evenly deadlocked after a substantial period of deliberation, (2) that it lacked sufficient evidence to reach a verdict, and (3) that any verdict it might reach would be unfair are the attendant, aggravating circumstances needed to find that the jury's subsequent verdict was unduly coerced. The jury's note presented adequate indicia of its inability, not only to reach a verdict, but to reach a verdict which, in its opinion, would be fair to both parties. Hence, the court should have, *sua sponte,* declared a mistrial and discharged the jurors. Its failure to do so was prejudicial error.

B

The additional fact that the court gave *no* neutral supplementary instruction only enhanced the coercive effect of the other circumstances. Even *if* the jury *had not* articulated its inability to reach a fair verdict, we must conclude that in the absence of the appropriate supplementary instructions for situations such as this, the trial court's statements unnecessarily and prejudicially exacerbated the potential for coercion. Well-intentioned, off-hand statements are no substitute for proper, carefully worded instructions. A neutral supplementary instruction would have cautiously suggested to the jury the desirability of arriving at a verdict without coercing it into doing so, or enhancing that possibility. Such an instruction should contain, at least in part, the following language:

" '* * * Ladies and gentleman of the jury: The court is advised that you have indicated difficulty in reaching a verdict. Now, the court suggests to you that since the trial of this case means a great deal to the parties and to the public, and has been expensive in time, effort, and money, the court urges you to make every reasonable effort to agree on a verdict.

" 'You may consider that this case must at sometime be decided, and that you were selected in the same manner and

from the same source from which any future jury must be selected.

" 'There is no reason to suppose that the case will ever be submitted to twelve individuals more intelligent, more impartial, or more competent to decide it, or that additional evidence will be produced by either side.

" 'It is your duty to make every reasonable effort to decide the case if you can conscientiously do so. The court instructs you to return to the jury room and continue your deliberations.' " *State* v. *Maupin, supra,* at 482, fn. 3.

In addition, the following language, which was substantially incorporated into the trial court's general charge to the jury, should be re-emphasized in any supplementary instruction:

" 'Consult with one another, consider each other's views and deliberate with the objective of reaching an agreement if you can do so without disturbing your individual judgment.

" 'Each of you must decide this case for yourself. But you should do so only after a discussion and consideration of the case with your fellow jurors. Do not hesitate to change your opinion if you are convinced that it is wrong. However, you should not surrender honest conviction in order to be congenial or to reach a verdict solely because of the opinion of the other jurors.' " *Id.* at 484.

The purpose of the above-quoted instructions should be clear. Jurors are to be encouraged to reach agreement on a verdict if they can do so consonant with the dictates of their individual consciences. But a rush to judgment must be avoided, notwithstanding, as in this case, an explicit indication by the jury that any verdict it returned would not be a fair one. Accordingly, appellant's fifth assignment of error is well-taken. Having so ruled, we further find that appellant's sixth assignment is now rendered moot, and, consequently, it is not well-taken.
* * *

On consideration whereof, the judg-ment of the Sandusky County Court of Common Pleas is hereby reversed. This case is remanded to said court for further proceedings.

*Judgment reversed*
*and case remanded.*

CONNORS, P.J., concurs.

DOUGLAS, J., dissents.