**The STATE of Ohio, Appellee,**

**v.**

**ADAMS, Appellant.**

[Cite as *State v. Adams* (1991), 76 Ohio App.3d 268.]

Court of Appeals of Ohio,
Butler County.

No. CA90–10–210.

Decided Oct. 28, 1991.

*John F. Holcomb,* Butler County Prosecuting Attorney, and *John J. McCracken,* Assistant Prosecuting Attorney, for appellee.

*Al Edmunds,* for appellant.

Jones, Presiding Judge.

At approximately 7:00 p.m. on December 29, 1989, Vona James left her Hamilton, Ohio home and drove to Hoppy's Garden, a nearby tavern at the intersection of Tenth Street and Greenwood Avenue. Because of winter weather conditions—low temperatures and an accumulation of snow on the ground—James was dressed in a sweater and jeans, suede boots and a light fur jacket and scarf. James had been drinking at home and had several more drinks at Hoppy's. Later that evening, defendant-appellant, Thomas E. Adams, and a companion, Eric "Hoss" Riddle, arrived at Hoppy's. Appellant struck up a conversation with James, purchased drinks for her, mingled with other bar patrons, and alternated between the tavern's juke box and pool table. James apparently called appellant a son of a bitch several times for what she considered appellant's male-chauvinistic remarks. At one point, appellant told the barmaid, Wilma Hall, that "if she calls me a SOB one more time, I'll hit her." Whatever differences arose between James and appellant were apparently resolved, as James eventually wound up sitting on appellant's lap and the two were seen hugging and kissing. James later claimed she could not remember engaging in such conduct.

Sometime between 8:00 and 8:30 p.m., James left Hoppy's through the back door, closely followed by appellant and Riddle. Once outside, appellant instructed Riddle to return to the bar and wait, which he did. As James began to walk to her car, still followed by appellant, she "felt really scared" and noticed that appellant had "a strange look on his face" and "wasn't really saying anything." James turned to appellant and offered him her purse, thinking she was about to be robbed. According to James, appellant pushed aside the purse and said, "That's not what I want." Appellant then hit James in the face, her legs buckled, and she began to fall to the ground. Appellant

grabbed James and forced her into his nearby automobile where the two struggled. When appellant attempted to kiss James she bit him on the lip. Appellant then forced James to perform fellatio, whereupon James bit him again, prompting appellant to respond violently. Appellant then began repeatedly hitting James about the face and head. James could not remember anything else until she awoke in a hospital.

At approximately 9:53 p.m., Hamilton Police Officer James Cifuentes responded to a report of a woman in an alley between the Great Miami River and North Second Street in the vicinity of Black Street, approximately one-half mile from Hoppy's Garden. Upon arriving at the scene, Cifuentes found James, who was naked from the waist down, staggering in the alley and clutching her clothing. James had been severely beaten about the head and face. She was also upset, incoherent and intoxicated. James was taken to nearby Mercy Hospital where she was treated for multiple lacerations and broken bones in her face, a cracked rib, and bruises to her neck, face and head. In addition, James registered .268 percent on a blood-alcohol test.

At approximately 10:00 p.m., appellant returned to Hoppy's Garden. Wilma Hall noticed that appellant's lower lip was bloody and swollen, and that the knuckles on his one hand were scraped and bloody. Appellant also had blood smeared on the front of his shirt in the abdominal area. Appellant told Hall he had been in a fight, and appeared nervous and upset. Appellant asked about Riddle and Hall told appellant Riddle had already left and gone home, whereupon appellant left.

Hamilton Police Detective Terry Keene assembled a photograph array, which he showed to James on January 3, 1990. Despite the inclusion of appellant's photograph in the array, James could not identify any of the photographs as that of her assailant. Although James could not identify appellant from his photograph, she did, however, inform police that her assailant told her his name was "Thomas Adams." On that same date, three witnesses from Hoppy's Garden who viewed the same array all identified appellant as the individual who left with James. Appellant was subsequently arrested and indicted for one count each of rape in violation of R.C. 2907.-02(A)(2) and felonious assault contrary to R.C. 2903.11(A)(1).

At trial, appellant testified that he met James at Hoppy's Garden where he conversed with her and bought her drinks. Appellant also testified that James sat on his lap and that the two exchanged kisses. Appellant admitted that he left the bar accompanied by James and Riddle, but denied telling Riddle to go back inside. Appellant claimed that Riddle struck James on the side of the face when Riddle and James began arguing over who would sit in the front seat of appellant's automobile. According to appellant, Riddle

pushed James into appellant's car, entered himself, and continued to have words with James and struck her again. Upon leaving Hoppy's, appellant drove around the corner to Riddle's mother's house on nearby Vine Street, and ordered Riddle and James out of his car. Appellant testified that he then went to another tavern before proceeding to his cousin's house. Appellant denied that he ever returned to Hoppy's Garden that evening.

A jury found appellant guilty as charged. The trial court sentenced appellant to seven to twenty-five years on the rape count, with five years' actual incarceration. The court also sentenced appellant to a concurrent five-to-fifteen-year sentence on the felonious assault count. On appeal, appellant submits two assignments of error, which read as follows:

Assignment of Error No. 1:

"The defendant/appellant herein was denied due process of the law as guaranteed by the Fourteenth Amendment to the Constitution of the United States and Article I, Section 10 of the Constitution of the State of Ohio, by the prosecutor's misconduct in cross-examining the appellant on his pre-trial silence and commenting in closing argument on said silence as indicating appellant's guilt."

Assignment of Error No. 2:

"The verdict of guilty for felonious assault and rape were [*sic*] against the manifest weight of the evidence and contrary to law."

In his first assignment of error, appellant claims that the prosecutor violated appellant's due process rights by impermissibly cross-examining appellant on the subject of his prearrest silence and compounded the error by commenting on appellant's silence during closing arguments.

The record reveals that Detective Keene obtained a warrant for appellant's arrest on January 17, 1990. After obtaining the warrant, Keene went to appellant's wife's place of employment and advised her that a warrant had been issued for her husband's arrest. Appellant responded by telephoning Keene and telling him he would turn himself in within the next day or so. A week later, appellant telephoned the police and left a message for Keene, again indicating that he would turn himself in on the warrant. Appellant never did turn himself in and was subsequently arrested on February 15, 1990.

On direct examination, appellant testified that he never talked with the police until Keene informed his wife that there was a warrant for appellant's arrest. On cross-examination, the following exchange occurred between the prosecutor and appellant:

"*Q.* Did you know Det. Keene wanted to speak to you about his case?

"*A.* Well, I talked to Det. Keene one time on the phone after he went to my wife's work.

"*Q.* Ok. And what ... and what did you say to him?

"*A.* Well, I just asked him ... why there was a warrant issued for my arrest.

"*Q.* You had no idea?

"*A.* No, sir. I did not.

"*Q.* Did you tell him you'd come in and talk to him about it?

"*A.* Well, he'd already signed a warrant. I ... I went and turned myself in after I found out that they had issued a warrant for me.

"*Q.* How long after you talked to Det. Keene was that?

"*A.* I think I talked to him on a Friday ... I'm not sure, but it ... it wasn't that long after I talked to him that I went and turned myself in.

"*Q.* In fact, it was a couple weeks from the time you talked to him before you turned yourself in, wasn't it?

"*A.* Of that I'm not sure.

"*Q.* Didn't you feel it was important to run right into the police station and tell them you were innocent?

"*A.* Well, I knowed I hadn't done nothing.

"*Q.* Didn't you ... well, didn't you feel it was important to run in there and tell them right away?

"*A.* Well, it was important ...

"*Q.* Clear your name?

"*A.* Well, it was important, but he had made the statement to my wife, 'Mr. Adams has a warrant on him in Fairfield and I'm going to nail his ass and then I'll have him up here.'

"*Q.* Ok.

"*A.* That's what he said. So I mean I ... I didn't know at the time that I had the warrant on me in Fairfield until he told my wife. So I went down there and took care of that, then I come up here and I turned myself in.

"*Q.* And how long was that after you talked to Det. Keene?

"*A.* Sir, I don't know.

"*Q.* Ok. Isn't it a fact that after ... after Det. Keene talked to you the first time on the phone you said you would come right in?

"*A.* I told him I would be in after I took care of the warrant in Fairfield.

"*Q.* And isn't it a fact that a week later Det. Keene called you again ... or, excuse me, isn't it a fact that a week later you called Det. Keene and said you'd be right in?

"*A.* Well, no, I called and left a message, Det. Keene wasn't in.

"*Q.* Umhum. And you left ... and that message was that you'd be right in.

"*A.* Well, I told them that I would be coming in."

During closing argument, the prosecutor made the following comment:

"Ladies and gentlemen, if the defendant's innocent ... why didn't he go talk to Det. Keene? Because I'll tell you why. The defendant has and still does have all the evidence in this case. He had to let that lip heal, he had to let his penis heal. He has the car that has blood in it, he has the shirt that has blood on it."

Appellant cites *State v. Sabbah* (1982), 13 Ohio App.3d 124, 13 OBR 155, 468 N.E.2d 718, in support of his position. In *Sabbah*, the defendant was charged with murder and arrested forty-five minutes after the homicide. Upon being informed of his rights, the defendant invoked his right to remain silent, making no statements to police officers, either at the time of his arrest or when returned to Fremont, Ohio, where the shooting had occurred. At trial, the defendant testified and admitted the shooting but claimed that he had acted in self-defense. The prosecutor, in both his cross-examination of the accused and his closing arguments, commented on the defendant's failure to inform the police that the shooting had been in self-defense. The Sandusky County Court of Appeals held that the prosecutor could not comment on the defendant's silence, since the silence lacked significant probative value, was likely to be ambiguous, and carried an intolerably prejudicial impact.

The *Sabbah* court recognized, however, the common-law principle, now embodied in the Ohio Rules of Evidence, that silence may be used for impeachment purposes by reference to an individual's previous failure to assert a fact under circumstances in which it would have been natural for him to do so. In establishing a proper foundation for introducing the accused's silence to the jury, the state must demonstrate that the defendant, in remaining silent or in failing to contradict the accusatory statement, thereby unequivocally manifested his assent to it because he had been called upon to speak, it was natural for him to do so, and he had a motive for responding. *State v. Sabbah, supra,* 13 Ohio App.3d at 130, 13 OBR at 161, 468 N.E.2d at 725. See, also, *Jenkins v. Anderson* (1980), 447 U.S. 231, 100 S.Ct. 2124, 65 L.Ed.2d 86.

The *Sabbah* court relied on Evid.R. 403(A), which establishes a mandatory rule of exclusion for relevant evidence the probative value of which is substantially outweighed by the danger of unfair prejudice of the jury, to determine whether the defendant's prearrest silence was admissible for impeachment purposes. In determining whether the probative value of prearrest silence is substantially outweighed by the danger of unfair prejudice, the trial court should determine, on a case-by-case basis, the precise circumstances under which a defendant's prearrest silence, when juxtaposed to his exculpatory testimony, is so generally inconsistent with it that references to such silence are probative of credibility or recent fabrication. *State v. Sabbah, supra,* 13 Ohio App.3d at 136, 13 OBR at 168, 468 N.E.2d at 730–731. See, also, *State v. Cline* (Feb. 1, 1988), Fayette App. No. CA87–07–007, unreported, 1988 WL 10416.

Applying these principles to the case at bar, we find that defense counsel, on cross-examination of Keene, first raised the subject of appellant's silence by asking Keene why he had never discussed the matter with appellant. Furthermore, appellant did not turn himself in but avoided contact with the police until a sufficient time had elapsed for his incriminating wounds to heal. If, as appellant claimed, he had not done anything wrong, it would have been natural for him to immediately respond, but he failed to do so. This is not the classic case of a defendant remaining silent within the context of a prearrest face-to-face confrontation with police as in *Sabbah.* However, appellant's nonappearance and limited response to knowledge of the warrant for his arrest are themselves forms of silence and sufficiently warrant the introduction of his prearrest conduct or "silence." We therefore conclude that appellant's constitutional rights were not violated by the impeachment use of his prearrest conduct or silence. The first assignment of error is hereby overruled.

■ In his second assignment of error, appellant argues that his convictions were against the manifest weight of the evidence and contrary to law. Appellant takes the position that James was unable to make a positive identification of her assailant within a reasonable amount of time after the assault and rape, and could make a positive identification only as the result of overly suggestive police procedures.

Admittedly, James could not identify appellant from the photo array which Keene presented to her a few days following the assault. However, whereas appellant had short hair and was clean-shaven on December 29, the photograph of appellant used in the array was several years old and depicted him with longer hair and a mustache. Despite her inability to select appellant's photograph, James positively stated that the individual who assaulted her was

Thomas Adams. James did finally identify appellant at his initial appearance. The circumstances surrounding the identification involved Keene informing James that appellant had been arrested and accompanying her to the courtroom, where she was asked to point out her assailant if he appeared. The courtroom was fairly crowded and James was not told when or how appellant was to enter the courtroom. When he finally did, there was neither an announcement of his case nor any other feature which would suggest appellant's identity. James recognized appellant immediately upon his entrance, turned to Keene, and informed him that appellant was the man who attacked her on December 29.

We do not find that this procedure was overly suggestive or that the convictions were against the weight of the evidence even without James's identification of appellant. In addition to James's testimony, the convictions rest on the testimony of other witnesses who placed appellant at Hoppy's Garden with James prior to the assault, and testimony that appellant returned to Hoppy's later that evening in a nervous and upset condition, with his lip bloody and swollen, his knuckles scraped and bloody, and blood smeared on his shirt. Appellant denied that he returned to Hoppy's after leaving in the company of the victim and Riddle. However, the jury, in determining the credibility of the witnesses, chose to believe the testimony of James and the other witnesses rather than that of appellant. See *State v. Jamison* (1990), 49 Ohio St.3d 182, 191, 552 N.E.2d 180, 188–189, certiorari denied (1990), 498 U.S. ——, 111 S.Ct. 228, 112 L.Ed.2d 183. A reviewing court will not reverse a jury verdict where there is substantial evidence upon which the jurors could reasonably conclude that the essential elements of the charged offense have been proved beyond a reasonable doubt. *State v. Eley* (1978), 56 Ohio St.2d 169, 10 O.O.3d 340, 383 N.E.2d 132.

Inasmuch as there was sufficient evidence to support all the essential elements of rape and felonious assault, we find that appellant's convictions were neither against the manifest weight of the evidence nor contrary to law. For these reasons, appellant's second assignment of error is overruled.

*Judgment affirmed.*

WILLIAM W. YOUNG and WALSH, JJ., concur.