[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] OPINION.
Please note: we have sua sponte removed this case from the accelerated docket.
On January 30, 1998, Ben Bland was walking home from work when he was shot in the groin area. He sustained life-threatening injuries, but survived. Defendant-appellant Tony Beasley was arrested for the incident and was indicted on one count of attempted murder and two counts of felonious assault. Each count had a one-year and a three-year gun specification.
A jury trial was held. During jury selection, the state used a peremptory challenge to remove the only African-American prospective juror from the panel. Beasley made a Batson
objection,[1] but the court overruled it.
At trial, the state showed that Beasley had dated Bland's sister and that Beasley and Bland had once been good friends. According to the state, Beasley's relationship with Bland's family soured after Beasley fathered a child with Bland's sister. The evidence showed that, after this falling out, Beasley was attacked, or "jumped," at a Dairy Mart store and that Beasley believed that Bland was involved. The state's case was that Beasley shot Bland on January 30 in retaliation. Bland testified that he was shot in a well-lit parking lot and that he easily recognized that it was Beasley who shot him. Bland was the only witness who specifically identified Beasley as the shooter.
Beasley presented an alibi defense. Several witnesses testified that he was at a nightclub with them when the shooting occurred. They also testified that he had on different clothes and a different hairstyle than the shooter described by the state's witnesses.
During its deliberations, the jury presented several communications to the court. Initially, after about two hours and fifty minutes, the jury indicated that it was deadlocked. In response, the court, without any further instructions, returned the jury to its deliberations.
Later that day, the jury made a request that Bland's testimony be reread. It also asked for further explanation on the terms "burden of proof" and "reasonable doubt." The court had the court reporter reread Bland's testimony in its entirety. But the court did not offer much further explanation of "burden of proof" or "reasonable doubt." The court simply told the jury to refer to the written jury instructions that had already been provided. It also told the jury to use its common sense:
 When you look at that reasonable doubt[,] it talks about other things. It uses the phrase common sense. I recognize the jury instructions can be imposing for a jury[,] but I do tell you that the jury instructions don't require you to leave your common sense at the door of the jury room when you go in. You are free to use your common sense.
 During the second day of deliberations, a Friday, the jury again informed the court that it was deadlocked. It wrote a note to the court that stated that "[t]he one juror who retains doubt firmly believes that [the] doubt is reasonable doubt and refuses to alter that belief regardless of the persuasive effort of the other 11." In an effort to encourage the jurors to reach a verdict, the court gave a supplemental instruction that complied with the mandates of State v. Howard.[2] At the end of the instruction, the court informed the jury that, if it did not reach a verdict that day, it would not resume deliberations until the next Tuesday because there was a holiday weekend:
 * * * And I don't know if you'll reach a verdict today, and I don't know when you'll reach a verdict. But I'm not going to keep you here over a holiday weekend. In other words, if you're worried about me bringing you in here Saturday, Sunday and Monday, I won't do that.
 It doesn't mean I won't have you back Tuesday, if necessary, but I'm not going to spoil your weekend.
 Later that Friday, the jury requested another rereading of Bland's testimony. This time it requested a rereading of the testimony regarding Bland's identification of Beasley. The court complied with the request by having the court reporter reread the direct and cross-examination testimony about the identification.
Finally, on the same day, the jury asked, "Can a juror who considers the defendant's alibi a lie use the fact that it is a lie as evidence against the defendant?" The court informed the jury that it should refer to the jury instructions regarding the alibi, as well as the instructions about reasonable doubt and the credibility of witnesses.
On Tuesday, the jury reached a verdict. It found Beasley guilty of attempted murder, both counts of felonious assault, and all the gun specifications. For sentencing, the felonious-assault counts merged with the attempted-murder count. The court sentenced Beasley to ten years' incarceration for attempted murder and to three years for the gun specifications, for a total of thirteen years' incarceration. The ten years that the court gave for attempted murder, a first-degree felony, was the maximum time allowed under Ohio's sentencing guidelines.[3]
Beasley now appeals his convictions and sentence. He asserts six assignments of error, all of which we overrule.
 I. Jury Deliberations
In his first assignment, Beasley asserts that the court's responses to the jury's communications during deliberations coerced the jury into reaching guilty verdicts. Beasley claims that the court should have declared a mistrial. His argument comes in various parts.
To begin, Beasley argues there was error when, after the jury initially declared a deadlock, the court returned it to its deliberations without further instruction. He suggests that the court should not have waited so long to give the Howard
charge and that the court should have declared a mistrial after the jury revealed the status of its deliberations (that only one of the jurors believed that there was reasonable doubt). We disagree.
In general, the law encourages jurors to agree, not to deadlock, and a court may urge a jury to make every reasonable effort to reach a verdict.[4] Here, the jury had not even deliberated three hours when it first indicated that it was deadlocked. Under the circumstances, the court acted well within its discretion by sending the case back to the jury without further instruction and by waiting to give the Howard
charge.[5]
And the court did not err when it gave the Howard charge after it learned the status of the jury's deliberations. Although it would have been better if the jury had kept its status a secret, the court did not abuse its discretion by continuing the deliberations. By giving a proper Howard charge, the court encouraged the jurors to reach a verdict if they could do so conscientiously, and it instructed all the jurors, not just the one in the minority, to reconsider their opinions in light of the fact that others did not agree.[6] We apprehend no coercive atmosphere.
Also, the court did not err when it commented that the jury might have to return to deliberations after the holiday weekend. Beasley claims that the court's comments suggested that a deadlock was not acceptable and that the jury would be required to deliberate indefinitely until a verdict was reached. But we conclude that the court's comments were merely intended to assure the jury that it would not have to deliberate during the holiday weekend. They were intended to assure the jury that it would have additional time to deliberate if necessary. Such comments were not coercive, and the court did not err by giving them.[7]
Beasley's second argument attacking the court's responses to the jury's communications involves the court's rereading of Bland's testimony. Beasley claims that the rereading unfairly highlighted the victim's testimony and that the court improperly singled out parts of the testimony when it was reread. But a trial court has discretion, upon a request from a jury, to read all or part of the testimony of any witness.[8] Here, the court merely complied with the jury's requests: first to reread Bland's entire testimony, and second to reread Bland's identification testimony. The rereading included both the direct and cross-examination of Bland. The court was careful to have the same court reporter read the testimony on both occasions, and before the court reporter read the identification testimony, the court had her check her notes and block out the parts of the testimony that did not deal with identification. We hold that the court acted within its discretion in complying with the jury's requests.
Beasley's third argument is that the court erred when it responded to the jury's question regarding the definition of reasonable doubt by telling the jury to use its common sense. Beasley argues that the Revised Code requires courts to give a specific definition of reasonable doubt and that the court erred by straying from that definition when it referred to common sense.[9] But, when the court gave its original instructions to the jury, it gave the definition of reasonable doubt required by the Revised Code, a definition that describes reasonable doubt as "a doubt based on reason and common sense."[10] We conclude that, when the court referred to common sense in response to the jury's question, the court was merely reiterating the reference to common sense under the statutory definition. We find no prejudice in such a reference.[11]
Finally, Beasley argues that the court erred in its response to the jury's question about its belief of his alibi. He claims that the court prejudiced him by telling the jury to look at the parts of the jury instructions regarding witness credibility. According to him, when the court referred to witness credibility, the court was essentially suggesting to the jury that he was lying. But we hold that there was nothing inherently coercive about the court's instruction. That instruction merely reminded the jury that it needed to make the ultimate determinations of the witnesses' credibility. Also, we note that the court told the jury to look again at the instructions regarding the alibi. Those instructions stressed that, even if the jury did not believe Beasley's alibi, the state still had the burden of proving that Beasley committed the crime. We believe that this reference to the instruction was entirely proper, and stress that this case is another example of the utility of furnishing the jury with written instructions.[12]
In short, none of the court's responses to the jury's communications, either individually or in combination, were improper — quite the opposite. The court acted well within its discretion, and Beasley's first assignment is overruled.
 II. Relevant Evidence
In Beasley's second assignment, he challenges the court's exclusion of certain evidence. Specifically, on Bland's cross-examination, Beasley's attorney asked if there were any people with whom Bland had current disputes. The state objected. The court sustained the objection and stated, "Ladies and gentlemen of the jury, you will disregard any reference to any disputes that this witness has with anybody else." Beasley argues that the court's instruction unfairly prejudiced him because it prevented him from showing that someone else might have had a motive to shoot Bland. We disagree.
Under Evid.R. 403(A), evidence is not admissible if its "probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Here, the evidence that Beasley wanted to be admitted would have had little probative value. Even if it was shown that Bland had conflicts with other people, Beasley offered no foundation that would have connected any of those people to the crime scene. Most likely, the evidence would have caused confusion and delay because, if it had been admitted, the prosecution then would have been forced to rebut by establishing the innocence of those other persons. Such collateral controversies could potentially have engulfed the trial.[13]
Thus, the court acted within its discretion by excluding the testimony. Beasley's second assignment is overruled.
 III. Jury Selection
In Beasley's third assignment, he asserts that the court erred by overruling his Batson objection. To prevail on aBatson objection, a party opposing a peremptory challenge must demonstrate a prima facie case of discrimination: the party must show that the removed juror is a member of a cognizable racial group and that there is an inference of discrimination by the striking party. If a prima facie case exists, the striking party must articulate a race-neutral explanation. That explanation need not rise to the level of a challenge for cause. Last, the trial court must determine whether the party opposing the peremptory challenge has proved purposeful discrimination. The court's determination will be given great deference and will not be disturbed on appeal unless it is clearly erroneous.[14]
Here, in support of a prima facie case of discrimination, Beasley's sole argument was that it was improper for the state to remove the only prospective African-American juror from the panel. In response, the state claimed that the juror was removed because she had a problem with the fact that only one witness would be able to identify Beasley as the shooter. The state pointed out that it had used a peremptory challenge on a white juror for the same reason.
We hold that the state offered a sufficient race-neutral reason and sufficiently rebutted any inferences of discrimination. The state had a legitimate reason to be concerned that a prospective juror might have problems with the fact that only one witness would be able to specifically identify Beasley as the shooter. That concern had nothing to do with the race of the prospective juror. Also, the fact that a white juror was removed for the same reason gives further support that the peremptory challenge was not related to race. Because the state offered a valid race-neutral justification, we do not have to address whether Beasley asserted a prima facie case of discrimination.[15]
We hold that it was not clearly erroneous for the court to overrule the Batson objection. Beasley's third assignment is overruled.
 IV. Insufficiency and Manifest Weight of the Evidence
In Beasley's fourth assignment, he alleges that there was insufficient evidence to sustain his convictions and that the convictions were against the manifest weight of the evidence. To reverse a conviction for insufficient evidence, an appellate court, reviewing the evidence in the light most favorable to the prosecution, must conclude that no reasonable trier of fact could have found the defendant guilty.[16] In reviewing a manifest-weight issue, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way and created a manifest miscarriage of justice so that the conviction must be reversed.[17]
Here, Bland was shot from a close distance, in a well-lit parking lot. Bland had once been good friends with Beasley and knew Beasley well. He testified that he clearly saw Beasley before he was shot and that he easily recognized Beasley as the shooter. Considering that a gun, a deadly weapon, was involved, and that Bland sustained life-threatening injuries, we conclude that there was sufficient evidence to convict Beasley of attempted murder and felonious assault. Also, despite the conflicting testimony presented by Beasley's alibi witnesses, we conclude that the convictions were not against the manifest weight of the evidence. When Beasley's case is weighed against the compelling evidence presented by the state, we cannot say that the jury clearly lost its way. Beasley's fourth assignment is overruled.
 V. Sentencing
In Beasley's fifth and sixth assignments, which we treat together, he challenges his sentence, the maximum term permitted by Ohio's sentencing guidelines.[18] His fifth assignment states that the court erred when it sentenced him to more than the minimum period of incarceration allowed under the guidelines. His sixth assignment asserts that the court erred when it imposed the maximum sentence. We disagree with both assignments.
R.C. 2929.14(B) provides criteria for imposing a sentence that exceeds the minimum term authorized under the sentencing guidelines:
 [I]f the offender previously has not served a prison term, the court shall impose the shortest prison term authorized for the offense * * *, unless the court finds on the record that the shortest prison term will demean the seriousness of the offender's conduct or will not adequately protect the public from future crime by the offender or others.
 R.C. 2929.14(C) outlines the requirements that are necessary for a court to impose the maximum sentence. One situation where the maximum term can be imposed is when offenders have committed the "worst forms" of the offense.[19] When the court imposes a maximum sentence, it must make findings that support its decision.[20] If a defendant appeals the sentence, an appeals court "may increase, reduce, or otherwise modify * * * or may vacate the sentence and remand the matter to the trial court for resentencing if the court clearly and convincingly finds * * * [t]hat the record does not support the sentence."[21]
Here, the court did not make any written findings on its sentencing worksheet regarding why it imposed more than minimum prison time on Beasley, who apparently had not served a prison term before this case. But, at the sentencing hearing, the court spoke about its concern for the type of street violence that occurred in this case. The court discussed its concerns for the safety of others in the places where such street violence occurred:
 Almost daily I either hear about or I read about instances where we have young predators roaming our streets, and they are either injuring or killing one another. And certainly you are not responsible for all those. I'm not trying to argue you are. But, you know, we see — we see no regard for the safety of others or the sanctity of life.
 We hold that, although the court did not use the specific wording under R.C. 2929.14(B) when it made these comments, it was essentially stating that it believed that the shortest prison term for attempted murder would "demean the seriousness of [Beasley's] conduct" and that the shortest prison term would "not adequately protect the public from future crime by [Beasley] or others."[22] We conclude that the record supports the court's decision to impose a sentence that exceeded the minimum term authorized under the sentencing guidelines
As for whether the maximum sentence was appropriate, the court noted in its sentencing worksheet that Beasley had committed the "worst form" of the offense. We recognize the difficulty of reviewing the "nebulous concept of the `worst' form of [an] offense,"[23] and we are aware that there is a presumption against the imposition of maximum terms.[24] But here, after reviewing the record, we must affirm the court's findings: we can not clearly and convincingly find that the record does not support the sentence. Beasley shot Bland, a former good friend, from close range. Bland did nothing on the night that he was shot to provoke the violence, and he suffered serious physical and emotional harm from the shooting. As the court pointed out, Bland "was left for dead," "could easily have died," and "still has a bullet in him." The court also specifically noted that Beasley showed no remorse or caring toward Bland, and the court found no reasons to mitigate against its conclusion that Beasley had committed the "worst form" of the offense. Under these circumstances, we conclude that the court was justified in imposing the maximum term. We overrule Beasley's fifth and sixth assignments.
Therefore, the judgment of the trial court is affirmed.
Judgment affirmed.
 Gorman, P.J., and Sundermann, J., concur.
Please Note:
The court has placed of record its own entry in this case on the date of the release of this Opinion.
[1] See Batson v. Kentucky (1986), 476 U.S. 79, 106 S.Ct. 1712.
[2] State v. Howard (1989), 42 Ohio St.3d 18, 537 N.E.2d 188, paragraph two of the syllabus.
[3] See R.C. 2929.14(A)(1).
[4] State v. Sabbah (1982), 13 Ohio App.3d 124, 138,468 N.E.2d 718, 733.
[5] See State v. Ballew (Feb. 26, 1999), Hamilton App. No. C-980442, unreported; State v. Dickens (May 8, 1998), Hamilton App. No. C-960365, unreported.
[6] Howard, supra, paragraph two of the syllabus.
[7] See State v. Hill (Feb. 19, 1999), Hamilton App. No. C-971098, unreported (holding that the court did not err by giving non-coercive additional remarks after a Howard charge); State v.Spencer (Apr. 22, 1997), Franklin App. No. 96APA09-1226, unreported (holding that the court did not err by stating that the jury would have additional time to deliberate if necessary).
[8] State v. Berry (1971), 25 Ohio St.2d 255, 267 N.E.2d 775, paragraph four of the syllabus.
[9] See R.C. 2901.05(B) and (D).
[10] See R.C. 2901.05(D).
[11] See State v. Van Gundy (1992), 64 Ohio St.3d 230, 233,594 N.E.2d 604, 606 (explaining that a court does not err if it gives a non-prejudicial amplification of the statutory definition of reasonable doubt).
[12] See State v. Kersey (Dec. 19, 1997), Hamilton App. No. C-960975, unreported.
[13] See State v. Heinish (Sept. 19, 1988), Cuyahoga App. No. 54427, unreported, reversed on other grounds (1990), 50 Ohio St.3d 231,553 N.E.2d 1026 (holding that the court properly excluded evidence that other people besides the defendant may have disliked the victim).
[14] Hernandez v. New York (1991), 500 U.S. 352, 364-365,111 S.Ct. 1859, 1869.
[15] Id. at 359, 111 S.Ct. at 1866 ("[o]nce a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot").
[16] State v. Jenks (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus; State v. Bridgeman (1978), 55 Ohio St.2d 261,381 N.E.2d 184, paragraph two of the syllabus.
[17] State v. Martin (1983), 20 Ohio App.3d 172, 175,485 N.E.2d 717, 720-721.
[18] See R.C. 2929.14(A)(1).
[19] R.C. 2929.14(C).
[20] R.C. 2929.19(B)(2)(d).
[21] R.C. 2953.08(G)(1)(a).
[22] See R.C. 2929.14(C); State v. Mirmohamed (Dec. 3, 1998), Franklin App. No. 97APA11-1492, unreported (trial courts need not recite "talismanic words" when imposing criminal sentences).
[23] See State v. Kershaw (Feb. 5, 1999), Hamilton App. No. C-980164, unreported.
[24] See State v. Howard (Sept. 11, 1998), Hamilton App. No. C-971049, unreported.